It's United States v. Mr. Garcia 226182 and United States v. Garcia Rodriguez 226194. And as I understand it, each appellant is taking 10 minutes. Is that your understanding, counsel? Yes, Your Honor. And we're each intending with the court's leave to reserve our own rebuttal time. All right. We'll see how that all works out. And then the government will have 20 minutes. All right, counsel. You may proceed. Thank you, Your Honor. May it please the court, counsel. My name is Shira Key-Valleman, assistant federal public defender. And I represent Tony Garcia. Tony Garcia twice moved for new counsel based on the breakdown of his relationship with his lawyer. In ruling on those motions, the district court was to be guided by a clear three-factor test set up by this court. But the district court mistook the test and abused its discretion when it denied the motions. And this court should reverse. The district court's biggest error was its failure to evaluate the scope of the conflict. The question that the court needed to ask was whether the conflict was so great that regardless of its origin, it now constituted a total breakdown of communication. And that doesn't mean literally I can't talk to the person sitting next to me. But rather, as this court has defined it, it can mean a severe and pervasive conflict with his attorney. And under that understanding, we have a total breakdown here. The motion made a prima facie case of this. It said we have this irremediable breakdown in our relationship and ability to communicate. It said, yes, this originated with something having to do with a motion to suppress. But now Mr. Garcia doesn't trust me, doesn't believe that we have the same goals, and doesn't believe that I'm fulfilling my role as a zealous advocate as required. And then at the hearing, that's fleshed out further. So we don't just have some simple disagreement of Mr. Garcia has a wrong impression about what the law is and can't be disavowed of it. It's not a mere strategic disagreement about how to get to the same place. And it's not something of minor import. Well, counsel, what do you do with the fact that the record shows that during the week before trial, they spoke over the phone. They met on Saturday and Sunday before trial started. They may have had their disagreements. But how does that meet the total breakdown standard? Because it's a question of timing. And the timing, I think, did come out pretty well at the hearing. So you have initial meetings. You have the passage of the date to file motions in the middle of December. You do have another big meeting after that, a little bit after. Then you have the holidays. You have Mr. Garcia having COVID. You have this snowstorm. And now the lawyer comes back in person over the weekend. Mr. Garcia doesn't have a copy of the discovery because that's not permitted in the Western District of Oklahoma. And so now- He had seen it. Didn't the attorney testify he'd seen it and she went through it with him previously? Oh, absolutely, Your Honor. I think the question here is, when does he get alerted about what the problem was? Why didn't she file this motion just to press? And that's when they're sitting together with the paperwork in front of them. Before that, she says, yeah, I went over it. I had this associate go over it. We didn't file anything. But now as they're getting into the nitty-gritty preparation for trial, he said, but these things didn't happen. And she says, well, I mean, we don't know exactly what went on. But what she tells the district court is, my analysis was accepting the facts in the police report. And I didn't hear him or I didn't understand him earlier. I'm not sure what went wrong. But now it's clear to me that he says that these are not the facts that happened. And at that point over the weekend, when exactly it happened, did it happen Saturday or Sunday? Did they try to work through it? Whatever it is, by the time she leaves the jail Sunday night, she said, this can't work anymore. I've been asked to withdraw. Here's my explanation of what happened. And she puts it before the district court. So the district court- What about harmlessness? You know, he's got 30 pounds of methamphetamine in his vehicle, with two false panels in the back. In your reply brief, you make two arguments, I think. One is that that wouldn't reflect overwhelming evidence on the 924C charge. My question about that is, well, the fire department is right next to the methamphetamine in his trunk. And so how could a jury come out and say, well, even though he's got the 30 pounds of methamphetamine both in the backseat and in the trunk, the gun is right next to the, you know, to one of the places that he's concealing the methamphetamine. And then your other argument is that, well, we don't know what a new lawyer would say. And that, I think, is a very creative argument, honestly, Mr. Bell. You know, I wonder if there's any authority for it. And I wonder if we can really entertain an argument like that, and not characterize this as structural error. I mean, to that degree, you would never be able to say any error is harmless because we don't know whenever the issue is a failure to allow substitution of counsel. I'd like to address both of those questions, Your Honor. So first, in terms of what the standard is for pretrial harmless error, I'm not coming up with this out of thin air. It's the standard this court announced in U.S. v. Thompson. You have to consider the error in context and determine whether it substantially influenced a defendant's ability to defend against the charges. And that case involved a delay in unsealing an indictment. And part of the question is this, yeah, but what would have happened? What would plea negotiations have looked like? And we don't necessarily know, but it remains the government's burden to prove. And there may be situations where the government can't prove what would have happened. How did this influence the defendant's ability to challenge it? I will also note that the government doesn't make an argument. This is maybe complicated to do. The government doesn't try to do it here. I don't think this court should do it for the government because it is a complicated thing. But I also don't think that it creates a situation where it's structural error. Because these types of motions can come up at all sorts of stages. So in law, it came up right before sentencing. A situation like that, I think it's gonna be much easier to evaluate what difference would it have made to replace counsel on the eve of sentencing. Or you have a case like Beers, where it happened after the government had already submitted all its evidence in the case. I think then, again, it's a much easier situation to sort of see was there harm or was there not harm in not changing the attorney moving forward. I do think it's gonna be more complicated in a case like this. But the government doesn't try to make the argument. We don't know would a new lawyer have come in and had a new motions deadline. The government hasn't tried to argue that they wouldn't have had a new motions deadline. If they filed the motion to suppress, we don't know what would have happened. But I will say what we know. Considering he apparently did have competent counsel, I understand the issue is communication, but he did have competent counsel. The court said that several times. She was one of the best. Why would we assume that her evaluation of whether or not the motion to suppress would have been successful would be any different were you to give a new attorney and a new deadline and start all over again? Well, because she said that her assessment was based on the facts that were contained in the police report. And now she's saying, before he said maybe, I didn't understand, but now she understands that it's saying, no, those facts didn't happen. I did not speed and weave. Now, this court actually has a record to look at that if it wishes to. It is not the record that was in front of the district court at the time. The government could have taken that record now and tried to prove harmlessness with it and didn't. But you have real problems with the deputy's unverified account with the traffic stop. What he basically says is he's standing on the side of a freeway outside of his patrol car. He sees this car zoom by him weaving among cars in dense traffic. He now gets into his patrol car, pulls out of the freeway into said dense traffic, about a quarter of a mile from the cloverleaf exit that apparently my client had gone through to get onto a different freeway. He apparently then catches sight of my client who's going 100 miles an hour and catches up to him within two miles. There's a lot of math that's involved here. Is that even humanly possible? Certainly it is a challenging thing to imagine. And so on those new facts, yeah, we may well have had a motion to suppress. And what would the downside here be of filing a motion like that? It's not frivolous, it has a factual basis. It could get rid of all of the evidence of what is found in his car. Moving on to the second question about the 924C. I will say there is a lot of evidence that goes to the drugs themselves. But when it comes to the 924C, the Supreme Court said in Rosemont, you need advanced knowledge. It's not enough that somebody else packed a firearm in your car and you did not know about it. And so that was the defense at trial, but it could have been a better defense at trial. That there is not direct evidence of who packed the car. I think the government has like one photograph that they think is evidence that he's the one who packed the car, but we don't have direct evidence that he packed the car, that he had, should I keep going? Bob, are you there? What? Judge, still there with the monitor, maybe just give me a minute. Okay, can you hear us, Judge Bachrach? Oh yeah, yeah. Okay, you went, the screen went dark and we lost you for just a second. But you're back. Oh, sorry, I was always here. Yeah, okay. Sorry. All right, thank you. We don't have the direct evidence of this gun, that he knew about it, that he'd either put it there or seen it or knew it was there. Obviously there are lots of drug trafficking cases that don't involve firearms, but do involve large quantities of drugs. And this court really explained very well in lot one about what the importance of true communication at trial is. And the government can't prove that there wouldn't have been true communication and that he could have testified in a way that would have defended against this 924-C. If I may have time for rebuttal, I would appreciate it, but I understand that I'm out of time. We'll see how things go. Thank you, counsel. You're welcome. Good morning, your honors. May it please the court, counsel. My name is Gregory Acton and I represent Juanita Garcia Rodriguez, an appellate in this case, and the mother of Tony Garcia's children. And I'd like to focus my arguments today principally on the lack of evidence against Ms. Rodriguez. I know that the government had a tough task here in prosecuting a passenger of a vehicle that was transporting drugs, and especially when that passenger had another reason to be present and because of a close personal relationship with the driver, that has to be a difficult thing to prosecute, but that does not justify lowering the beyond reasonable doubt standard, and that's what this appeal is all about. I went through in my brief, my opening brief, I tried to go through the record and pull out anything, well, basically the arguments that had made it trial level anyway, against Ms. Rodriguez, and went through those to show that what the prosecution was doing was simply adding suspicion to suspicion to suspicion, and that cannot add up to evidence sufficient to meet that reasonable doubt standard. And in fact, when you're doing that, if you have suspicion, what you have is suspicion, and you decide you're gonna run with that, you can find nefarious intent in all kinds of things, and that's how this whole prosecution came across. Well, counsel, could we just zero in on a couple of things that were at issue? Why is it plausible that Mr. Garcia and Ms. Garcia Rodriguez were driving from Bakersfield to Shawnee in less than two days to gamble? And that was the focus of the government's case, wasn't it? That's why I'm asking. Yes, and a couple of thoughts on that. One is we have this recent Walker case, 2023 case, 10th Circuit case, when it was talking about reasonable suspicion, and they talked about implausible travel plans as being not sufficient, typically, for reasonable suspicion for the original stop, so way down low standard of proof, whether or not that was sufficient, just these implausible travel plans of being insufficient to meet that very low standard. Well, there's implausible, and then there's implausible, and in this instance, it seems that all we have is that they're, it's not even two days, is it? It's less than, it's a little over a day, and they're gonna drive from California to Oklahoma, and the stated purpose is to gamble in Shawnee. Now, that may not alone be enough, but doesn't that get the government somewhere? I think that that may be, I mean, I always say it's evidence, given the definition of evidence, making something more probable than it would otherwise be, but I do think it's very weak evidence, in particular in this case, because she was talked into this trip, but we don't know what reason he gave for her going, and he did say that I don't wanna go alone, and so she agreed to go, and he talked into going. We don't have the evidence. We don't know, he's, again, he's got a preexisting relationship with her. He's, she's the mother of his kids. He's suddenly been stuck in a position where he's gotta get these drugs across country, and he doesn't have somebody to go with him, and so he talks to his ex-wife, or his mother's kids. After his brother says, after her brother says no. Right. He talks to his wife. Why isn't that, you know, when we've talked about interdependence, and the fact that there's these familial relationships, and in this case, there's two familial relationships at issue here. This is the father of her children. Right. And her brother also, she knows, is not able to go as he planned. Right. So why isn't there interdependence here, for one thing? On interdependence, the cases that have found that something like a personal relationship, there's the Hamilton case, it was the stepbrother. The stepbrother was actively working to forward the success of the venture. Same thing with the Gallegos case. This was a wife that was very substantively involved in all kinds of aspects of that drug operation, and so she was demonstrated by the evidence in those cases that they were interested in the outcome. They were interested in the venture having success, and we don't have that here. That's a critical... Why isn't that exactly the reason for her going along when her brother couldn't, and she seemed not particularly thrilled about it, and she's got two little kids. She's got their children. She's got to find somebody to take care of her at the last minute, as she says, and that familial relationship is the connection itself. But the benefit or the dependence that when you get back out has to be out of the... It doesn't have to be financial. It can be just the familial benefit, essentially, of assisting someone who... I disagree. You have that? I'm sorry. Okay, what case do you rely on for that? Well, again, Hamilton and Gallegos, in both of those cases, just because they're familial relationships doesn't mean that that was always involved. All of those cases said that they relied in both of those instances that each of those individuals had an interest in the success of that operation. There's no evidence here... But does it have to be a financial interest in the success, is my point. You can have an interest in this conspiracy, in the benefits of it, or in this relationship, I'm sorry, without it being financial. To benefit your partner, who's also financially responsible for your children, or to benefit your brother, it doesn't have to be a financial interest, is my point. It doesn't have to be financial, but in this case, there's no evidence that she cared that it went through. There's no evidence that she had any interest whatsoever, and the guy's showing up on the other end. Why did she go? What was, I mean, my understanding is you're saying it was essentially a romantic trip for the two of them to Oklahoma. I mean... That's what makes this like the Evans case in that loaning scales to a friend is not gonna be enough. Well, one of the bigger problems, I think, is one of the things that you alluded to earlier, Mr. Rackett, and that is Mr. Garcia had said he needed to get the drugs across country from Bakersfield to Oklahoma in a very short time period, and so he needs to do that. He asked his wife, Ms. Rodriguez, to accompany him, viewing the evidence at least favorable to the prosecution, why isn't it reasonable for a fact finder to infer, yeah, to make this hard drive to get from California to the strong end within a 24-hour period, not making any stops? Human beings can't stay awake that long and certainly not alert enough to drive across country like that, so I need somebody to accompany me so I can grasp, take a nap while you drive. Why doesn't that fit Judge Lawrence's point about the interdependence? It was indispensable, at least it's reasonable to infer that it was indispensable to have somebody else take the steering wheel and to make that hard drive. We still don't have any evidence about how Mr. Garcia explained that trip to her. Even if it was a hard drive, we don't know what she understood that drive to be, and if she found out in mid-course, that would not be sufficient, because there are alternatives and you left by the side of the road. Could I just ask in that regard, we're talking about the conviction for the conspiracy and then there's the conviction for the Travel Act violation. Do those rise and fall together or are they subject to any different analysis? The appeal, the weakness in both counts is the same as the lack of knowledge. That interstate travel and anti-drug trafficking, that falls on her lack of knowledge. I'd like to reserve the rest of the time for her. Thank you. Good morning, and may it please the court, my name is Tom Snyder. I'm the Assistant United States Attorney here on behalf of the United States of America. I intend to address some of the issues with respect to Juanita Garcia's arguments first and then I'll turn to Tony Garcia's. So at the outset, I want to make sure we frame the issue and I think the court understands this, but what Ms. Garcia's counsel portrays as suspicion based on suspicion, I would say is inferences from the facts and evidence presented at trial, which is 100% permissible. In fact, that is exactly what the jury is supposed to and is instructed to do. An inference is reasonable if it flows from logical and probabilistic reasoning with your jury's common experience and their common sense serving as the touchstone for that exercise. And the rule that prohibits the stacking of inferences, which is what I think counsel is referring to, just indicates that at some point along the rational continuum from the fact on the one hand and the conclusion on the other hand, that inference can become so attenuated that you can doubt the validity of the jury's conclusion. And I would submit to you that's not what we have here. And there's a number of different pieces of evidence that were presented from which the jury was and apparently did infer the ultimate question, which is did Ms. Garcia know what Mr. Garcia was up to and did she agree to help him get his drugs from California to Oklahoma? So for example, and Liz already touched upon this, she made two statements about their travel plans, both of which were 100% implausible and I submit to you it was reasonable for the jury to infer that they were lies made to law enforcement. One was that they were heading to the casino. And the second one was that she had no idea how long they would be gone. She had just been in the car with Mr. Garcia for 20-something hours. And it was reasonable, I think, for the jury to infer that that was an absolute false statement made by law enforcement. Counsel, could we just, on that last point, could we just back up to the evidence relating to her being asked to go on the trip? And as I understand it, we're looking at text messages, maybe for the most part or maybe only text messages. Were there any messages between Ms. Garcia, Rodriguez, and Mr. Garcia where there was reference to drug trafficking, either explicitly, implicitly, or in coded language? There were not any text messages where it was said that explicitly. There was a phone call in the midst of the text messages. But of course, we do not know what the content of that phone call was. Now, there's an argument, I think this is in the brief, about Mr. Garcia texting a picture of the Malibu to her. And the argument was, well, that would be to show that it was rigged and contained drugs. But how does a picture of a Malibu convey anything other than it's a Malibu? Well, the importance of the picture of the Malibu to me, actually, is the fact that he sent that picture to two people at the same time. The first person he sent it to was the 213 phone number. It was the person clearly in charge, the boss, if you will, of the organization. And he immediately sends that same picture to Juanita Garcia within minutes of each other. And I guess the question to me is, was it reasonable for a jury to infer from that fact and that sequence that the purpose of sending it to the boss was the same purpose of sending it to Juanita Garcia? Here's the car, rigged and loaded, ready to go. Well, but it didn't say it was rigged and loaded. It was just a picture of the Malibu. Correct. Correct. And how does it go to her knowledge? Well, I guess she knows that's the car they're going to drive it. That is correct. But again, I think that, again, and I'm relying heavily and unapologetically on the standard of review here, that the jury concluded she knew. And so the question is, could any rational try or fact have reached that conclusion on the evidence? What's the strongest specific evidence that she knew there were drugs in the car? So the one I would key on primarily is the one where she's asked on the side of the road whether she was involved in any illegal activity. She turns to the car, and she tells the officer, not me. Now, again, that doesn't necessarily indicate direct knowledge. But again, circumstantial evidence is perfectly acceptable. And there was a lot of circumstantial evidence. But when she indicates, well, if she was innocent, that would be a true statement, wouldn't it? Not me. It could be viewed as a true statement. But again, the jury could infer differently, right? So I know I'm not involved in any illegal activity. It would certainly be consistent with innocence if you want to go that way. But her saying not me. You're saying your strongest, I'm not trying to minimize it, but you're saying your strongest piece of incriminating evidence against her is her denial of guilt? No, well, maybe I misspoke on that. We've already addressed the implausible travel plans. That certainly is a big piece of it. And I don't know that I put in a hierarchy the various facts. Because, again, it's a totality. In terms of what she, I think that Judge Magnus's question is, what your strongest piece of evidence is that she knew that there was methamphetamine in the vehicle. And you're saying your strongest piece of evidence about her knowledge is when she says, not me. I don't even understand how you can infer anything incriminating from that. But maybe I'm just being naive. Well, and again, I think it's important. The question is, are you involved in any legal activity? And saying not me would indicate knowledge that, yes, Tony is involved in something. But I'm not involved. It's in order to minimize her personal role. Another point that is important is Ms. Garcia had methamphetamine in her bra. The same methamphetamine type of drug that was hidden in bulk inside the car. Now, most of the methamphetamine was hidden in the door panels that they were rigged. But one bundle was separate, a part where it was accessible through the trunk. And again, was it reasonable to assume where that methamphetamine that she had on her person came from? Did it come from the separate bundle? No, why is the dead being incriminated? Let's say she assumed that her husband gave her this little piece of quantity of methamphetamine that she stuck in a brassiere. And let's say she knew that he had gotten methamphetamine from some stash that he had at his house. How can you get from A to Z? How can you get from that to that she knew that this man would have 30 pounds of methamphetamine stashed away? She did, thus, gave her some methamphetamine. That doesn't mean she knew that this Malibu was stashed at 30 pounds of methamphetamine. Well, I guess I'll say two things. First of all, one, we can look at every individual fact in isolation and try to minimize each one. But of course, the jury's allowed to look at all of it together. So I think that's important not to lose sight of that. And second of all, what you're proposing, that somehow she may have gotten that at some point from the stash at home or from some other, is a possible reasonable inference. But we don't have to rule out other possible inferences. All we have to do is demonstrate that a rational jury could have reached the inference that we're proposing. So they could have inferred it came from someplace else. But they could have inferred at some point she got it directly from the brick that was in the trunk of the car, and therefore, knew the car had bulk methamphetamine in addition to what was on her purse. So that would be the argument. I think I was trial counsel below on this case. And that's essentially one of the things we argued. Did the jury need to find that she knew the purpose of the trip at the time she agreed to go? So they don't have to find. She has to join the conspiracy at some point in the process. So they could take off from, and they could get to the end of the driveway. And they could have a conversation where she says, oh, yeah, by the way, we're taking drugs to Oklahoma. We're not going to a casino. And she agrees to go along. So there can be a different point at which. OK, well, that actually, that's where I was going. Let's say it wasn't the end of the driveway, but maybe at some point along the way, I don't know, somewhere between California and Oklahoma, a jury could infer that she came to know that they were transporting drugs. But don't you still need to show that even having come into that knowledge that she agreed to and joined the conspiracy? We would have to demonstrate that, assuming she didn't know from the outset. But I think there's evidence from which that can be inferred. Certainly, she was, at almost any point where that might have happened, she continued on the trip. She continued with the car. Now, you could speculate, well, what was she supposed to do? Again, there was no evidence that there was any coercion in making her go. That's not on the record. She participated in it, as far as we know, willingly. At least the jury can infer that even if she did learn at some later point, she continued to assist them all the way, which, again, would be consistent with the sort of statements that she made after the fact, which we contend were lies to police officers about the nature of her travel plans, indicate that she, at some point, for sure, before they got arrested, knew what the purpose of the trip was. And she was agreeing to help Mr. Garcia successfully complete that. And of course, there's other evidence that we have, as well, the evidence of hard driving has been alluded to, the nervousness has been alluded to in the briefs. And certainly, on that point, the briefs make the point, well, maybe the nervousness had to do with the methamphetamine or a person, not the stuff in the car. That is a possible inference, for sure. But it's not the only reasonable inference. And I think the indication that their nervousness had to do with a much larger quantity, as opposed to the personal use amount she had on her, is also a reasonable inference the jury could have drawn. Mr. Acton was asked about interdependence. Where do you get interdependence on this record? So two potential things that come to mind. First of all, the conversation between the brother and Mr. Garcia that this was going to be for money. They were going to make money. The brother was going to make money helping bring that out. Now, there's no express conversation between Juanita Garcia and Tony about money. But certainly, you could infer that if the person who was going to go was going to get paid, the replacement person who was going to go was also going to get paid. So that's one. But money is not required. And that's where I think the familial relationship comes in. And what's different about this case and Evans and the loaning of the scales, if Ms. Garcia had loaned her car to Tony and then stayed at home, even if she knew that he was going to use it to transport drugs, I think we'd have an Evans situation. But we don't have that. She went with him. She agreed to help him to make his venture successful. And that's with a shared mutual benefit. What's the mutual benefit for her under those circumstances? Well, again, just I think the familial interest in wanting to see her, Tony Garcia, who she has a relationship with, help him be successful in drug trafficking, the hope of either financial benefit, but that's not required. I think the familial hope that she's helping him out of, again, loyalty or whatever that might be, that is sufficient, I think, under 10th Circuit law. And if I may, then I think I'd like to turn to the issue about substitution of counsel and with Tony Garcia. And the fundamental issue, and I want to make this clear at the outset, is I don't think the record below, or even here, actually shows that there was ever a complete breakdown in communication between counsel and Mr. Garcia. That is Mr. Garcia's burden to show that fundamental fact. The brief and the argument seems to presume that such a total breakdown exists, and then criticize Judge Friant for not effectively sussing out that that's what was going on. But I don't think there's really any evidence that that actually happened. So was there a problem? At the hearing, it seemed like there were a lot more questions from the judge directed to counsel, but pretty limited inquiry of Mr. Garcia. Does that present a problem here? I don't think so. I mean, so initially, you've read the transcript, obviously, and seen the questions. He initially framed, look, I understand you have this issue about the suppression motion. And that is one of your concerns, and Mr. Garcia affirms. And then he asked Mr. Garcia, is there anything else you want to tell me? Literally, anything else you want to say? And at that point, Mr. Garcia could have said something. And he did. He said, no, no, it's the police report, and it's a suppression issue. I wish he'd filed a motion to suppress. He didn't say a word about not being able to talk to her, not being able to trust her, about anything about the relationship breaking down to a point where they couldn't work together anymore. And certainly, between, if you step back a minute, the entire record of their relationship up to the eve of trial doesn't indicate any breakdown in communication. They visited a number of times in person, on the phone. The motion to suppress deadline is in December, prior to a big, lengthy meeting that they had that counsel testified to. And so again, I think it was pretty clear that they had communication up to that point. There was nothing indicating that the relationship had broken down. So could Judge Bryant have done more to press Mr. Garcia? I mean, certainly he could have in hindsight. But I think when he gives Mr. Garcia an opportunity in an open-ended question to say whatever he wants to say, I don't think we can fault or claim that it was abuse of discretion from Judge Bryant not to keep pushing and prodding and asking over and over again. And then he did turn. Because the motion does raise, it raises two issues. It mentions the suppression issue that they have to disagree about. And then it raises the issue about, I think she says, a breakdown in the relationship and their ability to communicate, which is not an uncommon thing for someone to allege an emotion, which is why Judge Bryant has the hearing. So he's going to inquire of counsel, who he's known, and obviously he's made some comments, respects her ability. Is this the kind of breakdown in communication that makes it so you cannot proceed in the case? Or is it something you think you can work through and work through trial? Because they're about to go to trial. And so his main focus at that point is, can you guys effectively communicate and do the things you need to do for this trial that's about to start? And Ms. Farrell, while she expresses some reservation, says, yes, we can talk. We can communicate. Essentially, there has been no total and complete breakdown in the relationship such that we can't continue. So on that record, that is true. But then, she's, and Judge Bryant, understandably, relies on that. And then after the trial is up, and after Gordar has begun, and she re-raises that issue, which suggests that she no longer felt comfortable in being able to communicate with Mr. Garcia. And Judge Bryant then simply, severely rejects that based on this prior ruling. But why shouldn't we be concerned that when she re-raises that issue, that things had degenerated from the time that she thought that she would be able to communicate with him, that she no longer felt comfortable in doing that? So I guess I have two thoughts on that question. First of all, when Ms. Farrell re-raises it, it certainly appears in the record she's re-raising it to preserve her record for appeal, right? She does not say there's been anything new or anything different has happened in the three-something hours between when the motion was decided and when the juries were picked. She says it's the continuing concern she has, which indicates it's the same concern as before. It just keeps going on. It doesn't indicate any real sea change in the nature of the conflict. And the second thing, I think that Gordar actually understood better that his problem was he no longer trusted her, which is, I think, what it's certainly, I mean, I guess you could try to read that in there. But that brings me to my second point, which is Judge Frye has just witnessed firsthand. Ms. Farrell and Mr. Garcia picked a jury from the bench. That's what happened between when the motion was initially denied and when it was renewed. So Judge Frye would have been in a position to watch the goings-on in the courtroom as they select parameteries, as they talk back and forth. And again, there's nothing indicating that that was not it. No one brought it to Judge Frye's attention. If it had been such a complete breakdown, hey, look, we can't even talk about human strike. We can't even talk about what objections we want to make or questions we want to ask. Did counsel indicate three hours later when she raises the issue again what had transpired or why she was raising it again? You say she wanted to preserve it for appeal, but I don't think that was taken into account. That certainly is implicit. I didn't read that. So I read it. Maybe I read it, just read it differently. But when she expresses it as a continuing, I read it as the same concerns before. She didn't elaborate that there was something new that happened. It was raised more as a, hey, look, this is the same issue. I just want to renew it at this point. But nothing really changed. There's at least nothing in the record indicating that anything had happened in front of Judge Frye while the blood here is going on that would have raised a new or different concern. So one of the final comments I think I'll make on that particular issue when it comes to the harmless error part of it, again, I think the evidence of Tony Garcia's guilt was pretty overwhelming. And I think to some extent that the brief gives it away a little bit when it says, for example, well, one of the things that could have happened had he allowed a new substitute counsel to come in is maybe a new substitute counsel would have filed a motion to suppress, and maybe that motion to suppress would have been granted. What that tells me is that this was really all it ever was about was a motion to suppress. There was no total breakdown in communication. Mr. Garcia was mad that his counsel did not file a motion to suppress. He wished she had. And if that's the evidence that maybe something different would have happened, it just circles back to the strategic disagreement that is not sufficient to support the motion to substitute counsel in the first place. I think the court did an adequate job investigating this issue at the time. At the time in this issue, I think the judge raised it as I think he had a concern. The motion to suppress should have been filed several months ago. Now here we are at the eve of trial, and what you're telling me is that you wish you'd filed a motion to suppress. So I don't think that was the end of the inquiry. That was just one factor. But I think it certainly was a concern that he was allowed to take into account. And I have about a minute left. I'm happy to answer any additional questions of the world. I'd be happy to see the rest of my time. Mr. Baccarat, do you have anything? I have my two minutes. Thank you. Thank you. I think we're out of time. Am I correct on that? Yes. You have 24 seconds. Oh, I'm sorry. You have 24 seconds. Thank you, Your Honor. The fact that the government does not have to disprove every alternative inference, the weaker their inference and the more likely the alternative inference is means they do have to disprove it. Just as a practical matter of meeting the burden, having the jury have the evidence it needs to conclude beyond a reasonable doubt. We don't have evidence that she even drove the car. He was exhausted in that patrol car. Thank you. Thank you. And there was no more rebuttal. All right, I think we've reached the end of the argument. Thank you all for the arguments this morning. We appreciate that. The case will be submitted and counsel are excused.